UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:24-cr-00104-001-RC |
| CHRISTOPHER GEORGE ROCKEY | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Christopher George Rockey to 27 months' incarceration, the midpoint of the guideline range, three years' supervised release, $2,000 in restitution, and a mandatory assessment of $100.[1]

## I.      INTRODUCTION

Rockey participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

---

[1] On October 30, 2024, Rockey filed a sentencing memorandum and motion for downward departure. The government will separately respond to Rockey's motion for a downward departure.

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Rockey, a 55-year-old former Marine from South Carolina, prepared for violence by bringing a helmet, goggles, hard-knuckled gloves, a two-way radio, and pepper spray to the Capitol. He entered the Capitol through the Senate Wing Door and confronted a police line trying to stop the mob from reaching the House Chamber. After spending about 20 minutes in the building, Rockey remained on Capitol grounds for hours. And, as police tried to clear rioters from the Upper Terrace later in the day, Rockey assaulted officers.

The government recommends that the Court sentence Rockey to 27 months of incarceration for violation of 18 U.S.C. §111(a)(1). A 27-month sentence reflects the gravity of Rockey's conduct, but also acknowledges his early admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 31, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Rockey's Role in the January 6, 2021 Attack on the Capitol

Rockey and his co-defendant Edward Picquet traveled to Washington, D.C., from South

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Carolina, picking up at least one other companion on the way. Rockey and his companions attended the former President's "Stop the Steal" rally by the Ellipse and then walked to the Capitol, approaching the Capitol from the west side some time before 2:20 pm.

Rockey—wearing a helmet—advanced towards the Capitol, climbing through scaffolding and up the North West Stairs to the Upper West Terrace.



Image 1: Screenshot from Exhibit 1 at 00:10
showing Rockey (circled in red) walking through scaffolding on the North West Stairs

The helmet was not the only protective gear Rockey donned that day. He also wore goggles, hard-knuckled gloves, carried a two-way radio, and, according to a companion, also carried pepper spray.



Image 2: Screenshot from Exhibit 2 at 00:04
showing Rockey (circled in red) walking towards the Senate Wing Door

Rockey walked past a line of officers in riot gear protecting another entry to the Capitol.

*See* Exh. 2 at 00:01-00:03. Rockey pulled a mask up over his face and, at approximately 2:23 p.m.,

entered the Capitol through the badly damaged Senate Wing Door.



Image 3: Screenshot from Exhibit 3 at 00:56 showing
Rockey (circled in red) entering the Capitol through the Senate Wing Door

From there, Rockey turned south, walked towards the Crypt, and ascended a set of stairs before

reaching the Crypt. He entered the Rotunda at approximately 2:27 p.m., and walked south through

the Rotunda and Statuary Hall to the Statuary Hall Connector. As he entered the Statuary Hall

Connector, Rockey joined a group of rioters were screaming, "We Want Trump."



Image 4: Screenshot from Exhibit 4 at 31:18 showing
Rockey (circled in red) chanting "We want Trump."

Rockey confronted a defensive line that police had formed in an attempt to keep rioters away from

getting closer to the House Chamber.



Image 5: Screenshot from Exhibit 5 at 5:10
showing Rockey (circled in red) confronting a line of officers

6



Image 6: Open-source photograph showing Rockey (circled in red) confronting a line of officers

Rockey remained near the front of the crowd in the area for over 5 minutes—donning goggles at

one point—before he and other rioters eventually overwhelmed the police line.



Image 7: Screenshot from Exhibit 5 at 8:57 showing Rockey (circled in red)



Image 8: Screenshot from Exhibit 4 at 36:51 showing Rockey (circled in red)

Rockey continued towards the House Chamber where he stood in the hallway as others tried to

open a door to the House Chamber. *See,* Exhibit 6, at 1:00:05. From there, Rockey turned east around the perimeter of the House Chamber and began walking with the crowd towards the Speaker's Lobby. Before reaching the Speaker's Lobby, at approximately 2:44 p.m., Rockey turned towards the East Front House door and exited the building. In total, Rockey spent approximately 20 minutes inside the Capitol.

      Rockey reapproached the door 10 minutes after leaving the Capitol, at approximately 2:54 p.m., and watched as police ejected other rioters from the building.



Image 9: Screenshot from Exhibit 7 at 14:12 showing Rockey (circled in red)

Despite leaving the Capitol building, Rockey remained on Capitol grounds for hours. At some point while on Capitol grounds, Rockey posed for a picture with one of his companions while that companion held up what appears to be a joint.

9



Image 10: Photograph showing Rockey at the Capitol

By at least 4:30 p.m., Rockey was on the Upper Terrace on the north side of the Capitol. At this point, officers with the Metropolitan Police Department had gathered on the Upper Terrace and were preparing to clear rioters from the area. At approximately 4:35 p.m., as the crowd yelled "traitors" and "hold the line," Rockey—still wearing his helmet, goggles, and hard-knuckled gloves—advanced to the front of the crowd and towards the police line. Once on the front line,

Rockey pushed an officer's shield, and threw his right shoulder and body into the officer's shield.



Image 11: Screenshot from Exhibit 8 at 6:49 showing Rockey (circled in red)



Image 12: open-source image showing Rockey (circled in red) grabbing an officer's shield



Image 13: Screenshot from Exhibit 9 at 00:26
showing Rockey (circled in red) grabbing an officer's shield

During the melee, Rockey grabbed the top of an officer's shield and tried to wrestle the shield away from the officer.



Image 14: Screenshot from Exhibit 10 at 14:31 showing Rockey (circled in red)

12



Image 15: Screenshot from Exhibit 9 at 00:37
showing Rockey (circled in red) grabbing an officer's shield

Rockey briefly retreated into the crowd. As police continued to try to clear the Upper Terrace, Rockey again engaged with police. This time, at approximately 4:37 p.m., Rockey grabbed an officer's baton, apparently trying to rip it from the officer's hands.



Image 16: Screenshot from Exhibit 11 at 00:07 showing
Rockey (circled in red) moments before he grabbed an officer's baton



Image 17: Screenshot from Exhibit 11 at 00:18 showing Rockey grabbing an officer's baton

At some point, Rockey left the Capitol, spent the night at a hotel, and drove back to South Carolina the following day.

### *Rockey's Statements*

In a June 12, 2024, interview, Rockey explained that he was excited to hear then-President Trump speak at the rally on January 6. He claimed that he wore protective gear so that he could protect others from counter protestors. Rockey said that the two-way radio he carried was something he used during a previous association with the Three Percenters but said that he has not been affiliated with the group since around October of 2020. (He denied any group affiliations to probation. PSR ¶ 67.) Rockey claimed that he wore the radio to maintain communication with one of his companions but said that the radio did not work and got lost during an altercation on January 6. He said that while he was near the House Chamber doors, an officer told him that they were all going to be arrested. Rockey stated that he was not aware of most of the violence on January 6 but stated that he left the building upon seeing violence between protesters and law enforcement near the House Chamber doors.

Rockey made several false claims during his interview. First, he claimed that when he entered the Capitol through the Senate Wing Door, there was an officer standing inside who told him it was ok to come in. But the CCV footage shows that there was no officer by the Senate Wing Door when he entered. Indeed, Rockey did not interact with or go near any officer upon entry to the Capitol building. *See*, Exh. 3, at 00:54-01:07. Instead, he turned and walked directly towards the Crypt, and appeared to raise a fist in triumph. *See*, Exh. 3, at 1:01. Rockey said that he heard a gunshot while in the Capitol, which is plausible given that a rioter was shot climbing through a

window to the Speaker's Lobby at approximately 2:44 p.m., the same time Rockey exited the building. But Rockey then embellished his story, claiming that he saw blood on the ground from what he believed to be the injured rioter's evacuation. CCV footage shows no blood on the ground in the areas of the Capitol that Rockey trespassed through, and he did not go through the doors to the Speaker's Lobby, where the shooting happened.

Rockey admitted that he stayed on Capitol grounds for about two hours after exiting the building. He claimed that he hung out until police started pressing people to leave. According to Rockey, he only confronted police after a flash bang was dropped into a group of people that included children. He clamed that this is what led him to assault officers. According to Rockey, he only grabbed the officer's shield so he could "talk" with officers.

## III.    THE CHARGES AND PLEA AGREEMENT

On February 28, 2024, a federal grand jury returned an indictment charging Rockey with eight counts, including, assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1). On, June 12, 2024, Rockey was convicted of this assault, based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Rockey now faces sentencing on assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report ("PSR") issued by the U.S. Probation Office, Rockey faces up to 8 years of imprisonment, up to 3 years of supervised release, a fine of up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly calculates the Guidelines as follows:

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **17** |

*See* PSR, ECF No. 42, ¶¶ 36-46.

The U.S. Probation Office calculated Rockey's criminal history as category I, which is not disputed. PSR ¶ 49. Accordingly, based on the total adjusted offense level, after acceptance of responsibility, at 17, Rockey's Guidelines imprisonment range is 24 to 30 months of imprisonment. Rockey's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained in the PSR.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

---

[3] The cross-reference in U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Rockey's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Rockey spent approximately 20 minutes inside the Capitol. Moreover, Rockey twice made his way to the front of the riotous crowd to confront a police line. The first time he approached a police line, he was inside the Capitol with a crowd trying to advance to the House Chamber. The second time, Rockey participated in a melee and attacked officers trying to clear rioters from the Capitol's Upper Terrace. Moreover, Rockey's attire that day—a helmet, goggles, hard-knuckle gloves, and pepper spray—is illustrative of his mindset in going to the Capitol on January 6: he contemplated not only a show of support for the former president, but a show of force. The nature and circumstances of Rockey's offense were of the utmost seriousness, and fully support the government's recommended sentence of 27 months of imprisonment.

### B.  Rockey's History and Characteristics

Rockey is a 55-year-old man from South Carolina. He served in the United States Marine Corps for four years and was honorably discharged in 1992. PSR ¶¶ 90, 93. His honorable service is commendable but also should have made him acutely aware of the gravity of the riot that was unfolding at the Capitol and the stress and danger that he and other rioters were causing for the police that day.

Rockey reported growing up poor with a tumultuous upbringing. Despite some instability in his home life, he maintains close and supportive adult relationships. Rockey's upbringing does

not mitigate his actions at the Capitol, which occurred more than 30 years after he left home.

Rockey was diagnosed with PTSD and appears to be getting good medical support from the Veterans Affairs Administration. Though somewhat mitigating, his PTSD does not excuse Rockey's physical assaults on police, including trying to rip away the shield one officer was using for protection. And though Rockey reported some medical conditions, there is nothing to suggest that the Bureau of Prisons cannot handle treatment of Rockey's medical conditions. Therefore, none of the disclosures relating to Rockey's childhood or health concerns should affect his sentence.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rockey's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

***Specific Deterrence***

In advance of sentencing, Rockey told U.S. Probation that before he assaulted officers on the Upper Terrace, he "was not aware or a witness to the violent events that took place earlier that day" and said he "should have followed [police] orders without questioning their tactics." PSR ¶ 35. But Rocky's own statements during his June 12, 2024 interview contradict this—at that time, he said he left the Capitol building after witnessing the violence towards police near the House Chamber doors. Moreover, he has not expressed true remorse and has failed to acknowledge the full extent of his conduct and violent actions that day. Rockey certainly anticipated violence, as evidenced by his helmet, goggles, gloves, and pepper spray. He stood at the forefront of a volatile stand-off between police and rioters as rioters tried to get to the House Chamber. And he plainly was not attempting to "talk" to police when he violently shoved them, attempted to rip an officer's shield away, and grabbed an officer's baton. Rockey's statements and lack of remorse demonstrate that an incarcerative sentence is necessary to provide specific deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*,

21

545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Phipps*, 21-cr-44-CJN, the defendant, like Rockey, assaulted multiple officers by pushing them and grabbing a baton while police were trying to clear the Upper Terrace.

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Both assaulted police after spending approximately 20 minutes inside the Capitol. And while Phipps publicly posted about his pride in participating in the January 6 riot, Phipps did not don protective gear while at the Capitol like Rockey did. Phipps faced a slightly higher guideline range (27 to 33 months of imprisonment) because he pled guilty to six counts without a plea agreement. Regardless, their conduct on January 6 was similar. Phipps was sentenced to 27 months of imprisonment followed by 36 months of supervised release.

In *United States v. Ortt*, 24-cr-224-LLA, the defendant assaulted multiple officers, including at one point grabbing an officer's baton, to overrun the police line on the West Front of the Capitol. Ortt made inflammatory statements online after January 6, and violated his release conditions. Ortt was convicted of 18 U.S.C. § 111(a) and faced the same Guidelines range. The court imposed a sentence of 27 months of incarceration. Rockey's conduct involves different aggravating factors not present in the *Ortt* case. Unlike Ortt, who did not enter Capitol, Rockey confronted a police line inside the Capitol before assaulting officers outside of the Capitol. Moreover, Ortt did not bring or wear protective gear.

In *United States v. Creek*, 21-cr-645-DLF, the defendant pushed through barriers, grabbed an officer, drove him back forcefully several feet, and hit him in the face shield of his helmet. Creek then shoved another officer in the shoulders and kicked him, causing that officer to fall. Next, Creek threw a ratchet in the direction of officers. After committing this assaultive conduct on the West Plaza, Creek tried, but failed, to enter the Capitol. Creek was convicted of 18 U.S.C. § 111(a) and faced the same Guidelines range. The court imposed a sentence of 27 months of incarceration. Like Creek, Rockey engaged with officers multiple times. First, Rockey went to the

forefront of the mob as the mob yelled at a line of officers trying to prevent rioters from reaching the House Chamber. Rockey then assaulted officers trying to clear the Upper Terrace, first by pushing an officer and grabbing that officer's shield, and then reengaging two minutes later and grabbing another officer's baton. Unlike Creek, who did not make it inside the Capitol, Rockey entered the Capitol and stayed inside the Capitol for 20 minutes. Rockey's conduct is as serious as Ortt and Creek's conduct and warrants a similar sentence.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

24

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Rockey must pay $2,000 in restitution, which reflects in part the role Rockey played in the riot on January 6.[8] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Rockey's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 135. Here, the Court authorized the Clerk of Court to accept pre-sentence payments towards the special assessment and restitution in the amount of $2,000.00. ECF No. 44.

## VIII.    FINE

The defendant's convictions for violations of 18 U.S.C. § 111(a) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to

---

[8] Unlike under the Sentencing Guidelines for which) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay. PSR ¶ 107 ("[I]t appears that the defendant would be able to pay a nominal fine in addition to restitution."). Thus, under the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $10,000 - $95,000. U.S.S.G. § 5E1.2(c).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of imprisonment (the midpoint of the advisory Guidelines range), three years of supervised release, $2,000 in restitution, and a mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/ Anna Z. Krasinski
ANNA Z. KRASINSKI
Assistant United States Attorney
New Hampshire Bar No. 276778
United States Attorney's Office
Detailed from the District of New
Hampshire
(603) 451-7851
anna.krasinski@usdoj.gov